UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Governor Wentworth Regional
School District,
    Plaintiff

    v.                               Civil No. 05-cv-133-SM
                                     Opinion No. 2006 DNH 031
Paul and Deborah Hendrickson,
As Parents and Next Friends of
Paul Hendrickson, Jr.,
    Defendants and Counterclaim Plaintiffs

    v.

Guy Donnelly, Paul MacMillan,
John Robertson, and Governor
Wentworth Regional School District,
    Counterclaim Defendants

# O R D E R

This case involves a public high school principal's decision to suspend a student for refusing to remove or cover a symbolic patch he wore on his outer clothing.  The case presents important issues of public school administration, pitting the obligation of teachers and administrators to provide a safe and violence-free educational environment, against the First Amendment right of public school students to free expression.  The particular facts of this dispute are unique, but it is undeniable that the eruption of fatal violence at Columbine High School and other public schools casts a pragmatic shadow on what otherwise might

be viewed as primarily an academic disagreement.  Although a
legitimate case can and has been made for each party's opposing
viewpoint, the court finds that school authorities were justified
under the circumstances in taking the action they did, and they
did not violate the student's First-Amendment rights.

### Introduction

Paul Hendrickson, Jr., is a senior at Kingswood Regional
High School, a public high school in New Hampshire's Governor
Wentworth Regional School District.  In the Spring of 2005, the
school's principal, Mr. MacMillan, told Hendrickson that he would
not be allowed on school grounds while wearing a particular patch
on his clothing.  Hendrickson's patch consisted of a swastika on
which was superimposed the international "no" symbol – a red
circle with a diagonal line through it.  The patch has been
characterized in different ways.  Hendrickson calls it a
"tolerance patch," signifying values of diversity and acceptance,
but it might be more objectively described as a "No Nazis" patch.

In any event, Hendrickson, invoking his First Amendment
rights, refused to remove it.  School authorities, in turn,
required him to leave unless and until he removed or covered it.

At first, Hendrickson was sent home with parental permission. Later, after he continued to arrive at school wearing the patch and his parents declined to authorize further voluntary dismissals, Hendrickson was suspended, for so long as he insisted upon displaying the patch.  (The School District did arrange for a home tutor to alleviate, to the extent possible, any educational loss.)

Wishing to resolve the conflict and clarify its legal obligations and responsibilities, the School District filed this suit, seeking a declaration of the parties' respective legal rights.  The District and Hendrickson also reached an accommodation, pendente lite, under the terms of which Hendrickson was allowed to return to school and to wear a substitute patch exhibiting the slogan "Censored for Now."

Disputes like this one are often more complicated than they first appear, and that is certainly the case here.  One's initial reaction to the very basic facts outlined above might well be that the student is, of course, entitled to express a political viewpoint at school by passively wearing a symbolic patch.  After all, such political speech is at the very core of the First Amendment's guarantee of expressive freedom.  But the basic facts

3

do not begin to tell the whole story, nor do they highlight the myriad of competing interests and values also entitled to legal respect and protection in a public school.  A balancing of interests is required, and striking the proper balance can be a difficult task.

The parties agree that the legal issues raised are probably amenable to disposition by summary judgment, since the material facts are, by and large, undisputed.  Cross-motions for summary judgment have been filed, and the record does not appear to present any trial-worthy factual issues.

## Factual Background

Before the somewhat complicated legal issues can be meaningfully considered, it is necessary to understand the factual context in which they arise.  The undisputed material facts – those that have legal significance – are presented in the light most favorable to Hendrickson, the party opposing summary judgment.[1]

---

[1]    The court will take up the School District's motion first.

Kingswood Regional High School is a public school.
Accordingly, the parties agree that school authorities were
acting "under color of state law" for purposes of 42 U.S.C.
§ 1983.  The school distributes a handbook to all students
describing minimum standards governing dress and behavior while
on school grounds.  Standards generally relevant to this dispute
provide:

> **Harassment is Against the Law.**  No one should have to
> tolerate harassment at school for any reason.
> Therefore, all employees, volunteers, parents, and
> students will interact with all persons in ways that
> convey respect and consideration for individuals
> regardless of race, color, marital status, national
> origin, creed, religion, gender, sexual orientation,
> age, or disability.  <u>Acts of harassment, hostility, or
> defamation, whether verbal, written, or physical, will
> not be tolerated and constitute grounds for
> disciplinary action including, but not limited to,
> suspension and/or expulsion from school.</u>  Legal
> agencies may be contacted.
>
> * * *
>
> **Dress Code.**  The Governor Wentworth Regional School
> <u>Board has a responsibility to assure that the
> atmosphere in the schools is conducive to learning and
> fosters an environment of respect</u>.  Student dress plays
> an important part in creating an educational tone that
> demands both academic rigor and high standards of
> discipline. . . .
>
> The standard for student dress in the Governor
> Wentworth Regional School District allows, within a
> defined set of parameters, a choice in clothing.
> <u>Generally speaking, each individual is allowed to dress
> according to her/his personal preference provided that
> the execution of her/his selection does not</u> interfere

5

with the rights of others, <u>cause disruption to the educational program</u>, damage school property, or is considered a health or safety hazard.

Exhibit E to defendant's memorandum (emphasis supplied).  The dress code goes on to provide that "[d]ress . . . shall not be such as to disrupt the teaching/learning process."  <u>Id</u>.

During the 2004-2005 academic year, administrators at Kingswood High learned of, and monitored, many incidents of bullying and harassment.  At least five of those incidents involved conflicts between two readily identifiable groups – one in which Hendrickson is a member (described or generally known as the "gay students") and a rival group (described or generally known as the "homophobes" and/or "rednecks").  In January of 2005, in response to a recognized increase in tension between those two groups, school administrators conducted a school-wide "Assembly on Tolerance."  The assembly focused on encouraging students to peacefully co-exist with others of different racial, religious, social, sexual, and political viewpoints.

That very afternoon, however, an incident of harassment or bullying occurred involving a member of Hendrickson's group and a member of the "redneck" group.  Administrators investigated the

6

incident and interviewed the victim, who was unwilling to name his harasser.  Subsequently, however, administrators were able to identify the harasser and imposed discipline.[2]

Shortly thereafter, the parent of a student associated with the "redneck" group contacted the school to report that she had received a threatening telephone call.  The caller warned that her home would be burned down.  School authorities advised her to keep her son at home until the matter could be investigated. Later that same day, the parent of another boy associated with the "redneck" group called the school to report that her son had received a threatening instant message over the Internet.  The sender threatened to carve his initials in her son's head.

Ms. Shatzer, the school's student coordinator, investigated both incidents.  She interviewed several students, including Hendrickson.  According to Ms. Shatzer, Hendrickson admitted that he sent the threatening instant message to the rival "redneck" group member.  Another member of Hendrickson's group admitted

---

[2]     These incidents are reported by the School District in an indistinct manner, no doubt sparing detail that might serve to identify particular students.  Two significant incidents discussed _infra_, however, do provide sufficient detail and provide adequate justification, in the overall context, for the action taken.

that he threatened to burn down the other student's home.
Shatzer affidavit, Exhibit B to plaintiff's memorandum (document
no. 25), at para. 7.  Hendrickson, however, denies involvement in
either incident, though he does not deny that each actually
occurred.

Ms. Shatzer contacted the parents of the boys who had been
threatened, told them that the school had identified the students
who made the threats, and that those students had been warned
against similar conduct in the future.  Both parents agreed to
return their sons to school the next day.  It is unclear whether
the victims of those threats, or school administrators, reported
the incidents to local police.

Despite continuing efforts to ease tensions between the two
groups, administrators learned a few days later of another
incident of harassment or threatening involving the same two
groups of students.  Again, Ms. Shatzer met with one of the
offending students, encouraged him to be more tolerant of members
of the rival group, and warned him against similar conduct in the
future.  The next day, school administrators again met with that
boy and, this time, they involved his mother.  Both the student
and his mother were warned that similar conduct in the future

would result in police involvement.  They also told the boy and his mother that all other students involved in the offending conduct would be given the same message.

Nevertheless, tensions between the two groups remained high. During lunch periods, the rival groups insisted on sitting at adjoining tables, with their backs to each other.  Tension between the two groups was "so palpable" that Principal MacMillan referred to the dining hall as the "DMZ" and instructed supervisors to keep a particularly close watch over the boys.

During February of that year, the school again sought to ease tensions between the two groups by meeting individually with students associated with each group and their parents.  School administrators informed the students and parents that any continued taunting, harassing, or threatening conduct would result in discipline and the involvement of the police. Nevertheless, a week later, another incident of harassment involving students from those two groups occurred.  Following an investigation by the school, three boys were suspended.  Once again, school administrators met with the students and their parents.

During one of those meetings, a parent informed Ms. Shatzer that she was concerned about what she believed was her son's unhealthy fascination with, and admiration of, Adolph Hitler. The parent said that her son viewed Hitler as a hero and she said he strongly believed in the ideals of the Nazi movement.  She also said that her son had been taking Hitler-related books out of the library, a fact that administrators later confirmed.  The record also reveals that, in an effort to intimidate or provoke members of Hendrickson's group, at least some of the boys in the "redneck" group would occasionally accost them in the school's hallways with renditions of the Nazi salute, "Seig Heil."  In his affidavit, Principal MacMillan says he construed those cumulative facts as warning signs of potential violence, especially given the widely publicized reports of fatal violence committed at other schools by students who also shared interests in Hitler and the Nazi movement.

On February 25, 2005, students began their winter break. They returned to school on March 7, 2005.  On that day, Principal MacMillan and two other school administrators met with the student who had been the subject of two incidents of harassment or bullying a few weeks earlier, and his parent.  They informed the student and his parent of their continuing efforts to diffuse

tensions between the two groups.  They also reported that they
had met with members of both groups and had warned everyone that
future acts of intimidation, threatening, and/or bullying would
not be tolerated and would result in police involvement.

School administrators credit their continuing vigilance and
affirmative efforts to confront and resolve these problems with
having had some positive effect on student conduct.  During the
following three weeks, there were no reported incidents of
harassment, taunting, or threatening behavior involving the two
groups.

On March 22, 2005, Principal MacMillan learned that a 16
year-old student in Red Lake, Minnesota, killed nine people at
his school, including a teacher and five students.  He also
learned that the student professed an admiration for Hitler, and
doodled swastikas in his school notebooks.  MacMillan met with
School Superintendent John Robertson to discuss his growing
concern that some of the students at Kingswood Regional High
School also seemed to be fascinated by Hitler and the Nazi
movement.

The next week, on March 28, 2005, Hendrickson and two other members of his group came to school wearing the patch depicting a swastika under the "no" symbol.  That day passed without incident.  The next day Hendrickson and his friends again arrived at school wearing the patch.  Principal MacMillan says that is when he first became aware of the patch's existence.  According to MacMillan's uncontested affidavit, he was concerned that Hendrickson's patch amounted to "a specific and targeted message at the group of students with whom [Hendrickson] and students with whom he associated had had several prior incidents  . . . two of which involved specific threats of physical violence [i.e., the telephone threat to burn down the house and the threat to carve initials in a student's head]."  MacMillan affidavit at para. 19.  A student wearing the patch (not Hendrickson) was summoned to the school's administrative offices and was asked to remove it.

Later that same day, Hendrickson, now aware that one of his friends had been asked to remove the patch, sought a meeting with school administrators.  Principal MacMillan and several other school administrators met with Hendrickson.  Principal MacMillan told Hendrickson that he was concerned about the volatile history between Hendrickson's group and the so-called "rednecks."  He

also said that he believed Hendrickson's patch was specifically aimed at, and designed to provoke a potentially disruptive or even violent response from that group.  He asked Hendrickson if there was another type of patch or armband that he could wear to express his views on tolerance, without provoking students in the rival group and causing a disruption in school.

Principal MacMillan says he told Hendrickson that he was concerned not only for Hendrickson's own safety, but for the safety of other students as well, given that the patch might spark a disruptive or violent response from the "redneck" group. Other administrators participating in the meeting offered to help in creating a forum or alternate vehicle for Hendrickson to express his stated goal of promoting tolerance.  Hendrickson said he did not wish to consider other options.  At that point, Principal MacMillan told Hendrickson that if he wished to remain in school, he would have to remove the patch.  Hendrickson refused.  He was then given the option of being suspended or having his mother voluntarily dismiss him from school. Hendrickson contacted his mother and she voluntarily dismissed him.  MacMillan informed Hendrickson that he could not return to school wearing the patch.

Following his meeting with Hendrickson, Principal MacMillan noticed that approximately six students had gathered in the administration office, waiting to see what happened to Hendrickson.  The assistant principal asked the students to return to class but, at least initially, they refused. Eventually, the students left the office and Hendrickson left school for the day.  Later, Principal MacMillan says, one member of the so-called "redneck" group told him that he considered Hendrickson's patch to be a "hate patch," specifically directed at him and his group.  Citing his concerns for potential disruption and violence in the school, MacMillan informed school officials that students were not allowed to wear the patch at school.

Notwithstanding Principal MacMillan's directive, Hendrickson returned the following day, wearing the patch.  Two other students joined him in wearing the patch.  Assistant Principal Donnelly again met with Hendrickson to discuss the situation, the potential for disruption and violence posed by the patch, and alternate means by which he might express his asserted message of tolerance – such as a different patch or wristband that did not target the "redneck" group or create the potential for

14

disruption.  Hendrickson said he would consider the idea, but would have to speak with his friends.

Donnelly later met with the two other boys in Hendrickson's group who had worn the patch that day.  He told them that he believed the patch was specifically targeted at the rival group with which they had ongoing problems of harassment, bullying, and threats of violence.  One of the students mentioned that, when they walked past students in the rival group, "they would say, 'Seig Heil' in an intimidating way."  Donnelly affidavit at para. 12.  Donnelly told the boys that incidents of that sort reinforced his belief that the patch was specifically designed to target or provoke a response from the rival group and carried with it the potential for disruption or violence in the school.

That afternoon, Hendrickson and the two other boys who had worn the patch met with Superintendent Robertson who, like Principal MacMillan, discussed with them the incidents of harassment and threats of physical violence between the two groups.  He also explained the school's obligation to provide a safe educational environment, free from bullying, harassment, violence, and other forms of disruption.  He then discussed alternative ways in which the boys could express their asserted

views on tolerance, that did not involve provoking the "redneck" group.

According to Robertson's affidavit, Hendrickson responded by asserting a First Amendment right to wear the so-called "tolerance" patch, and said he was not afraid of the "Nazis" and "homophobes."  When Robertson pointed out that the patch could lead to physical violence, Hendrickson replied that he "wanted to get into their faces."  He then added that, if a physical confrontation with the "redneck" group did occur, he would be prepared to take action against them.  Affidavit of Superintendent John Robertson, Exhibit D to plaintiff's memorandum, at para. 22.

Hendrickson was again given the option of suspension or voluntary dismissal with his parent's consent.  Hendrickson's mother agreed to dismiss him.  The next day, Hendrickson again returned to school wearing the patch.  This time, either he was not offered the option of dismissal, or his mother refused to permit it.  In either event, Hendrickson was suspended for the day and sent home.  When Superintendent Robertson learned that other students had also worn the patch to school, he instructed administrators to dismiss them if they did not agree to remove

16

the patch.  Most agreed, though two did not, resulting in a brief
confrontation between one of those students and school
administrators.

The following day, April 1, 2005, Hendrickson returned to
school, once again wearing the patch.  And, again, he was
suspended.  Later that day, Hendrickson's mother came to the
school to discuss the situation with Principal MacMillan and
Assistant Principal Donnelly.  They reviewed the history of
bullying, harassment, and hostility between the two groups, the
threatened acts of violence, and their belief that tension
between the two groups had to be relieved if further disruption,
and violence, was to be avoided.  They also told her that they
had spent a substantial amount of time with the students
themselves, with other administrators, and with the police, in an
effort to diffuse tension between the two groups.  When they
asked Hendrickson's mother whether she thought he would agree to
express his professed message of tolerance through different
means, she responded that the decision was her son's to make,
though she doubted he would agree to remove the patch.

Hendrickson appears to have remained out of school for
several days (if not weeks).  Some days, he came to school or

17

after-school events, without the patch.  Other days, it appears
he remained at home where he was tutored.  In May (the precise
date is unclear), Hendrickson returned to school wearing a patch
that said, "Censored for Now."  Administrators deemed that patch
inappropriate as well, though their reasoning is not disclosed in
the record, and Hendrickson was sent home.  Eventually, the
administration relented and, at the urging of Hendrickson's legal
counsel, allowed him to wear the "Censured for Now" patch during
the school day and on school grounds.

Hendrickson remains resolute in his belief that school
administrators unlawfully stifled his constitutionally protected
symbolic speech.  Administrators, on the other hand, remain firm
in believing that they acted appropriately, given both the
factual context in which they decided to ban the patch and their
obligation to provide a safe and secure educational environment,
reasonably free of disruption.

It is perhaps worth noting that, to the extent Hendrickson
was sincerely interested in expressing a message of tolerance,
school administrators were more than happy to help him spread
that message.  Indeed, it was a message they fully embraced and
were actively communicating to the student body.  Their concern,

however, was that Hendrickson's means of expressing tolerance, whether he intended it or not, could reasonably be viewed as a deliberate provocation of the adversary group.

## Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs–Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199–200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–

50 (1986) (citations omitted).  As the Court of Appeals for the
First Circuit has observed, "the evidence illustrating the
factual controversy cannot be conjectural or problematic; it must
have substance in the sense that it limns differing versions of
the truth which a factfinder must resolve at an ensuing trial.
Conclusory allegations, improbable inferences, and unsupported
speculation will not suffice."  Cadle Co. v. Hayes, 116 F.3d 957,
960 (1st Cir. 1997) (citations and internal quotation marks
omitted).  See also  Coyne v. City of Somerville, 972 F.2d 440,
444-45 (1st Cir. 1992) ("[T]hough for pleading purposes the line
between sufficient facts and insufficient conclusions is often
blurred, we nonetheless require that it be plotted.") (citation
and internal punctuation omitted).

     The key, then, to defeating a properly supported motion for
summary judgment is the non-movant's ability to support his or
her claims concerning disputed material facts with evidence that
conflicts with that proffered by the moving party.  See generally
Fed. R. Civ. P. 56(e).  Consequently, while a reviewing court
must take into account all properly documented facts, it may
ignore bald assertions, unsupported conclusions, and mere
speculation.  See Serapion v. Martinez, 119 F.3d 982, 987 (1st
Cir. 1997).

**Discussion**

Before resolving the parties' pending motions for summary judgment, it would be helpful to identify several issues that are not presented in this case.  First, as noted at the outset, the parties agree that those named in defendants' counterclaims are "state actors," who were acting under color of state law when they told Hendrickson he could not wear the patch.  See generally 42 U.S.C. § 1983.

Next, there does not appear to be any dispute that school administrators enforced the provisions of the Kingswood Student Handbook in a uniform manner.  That is to say, Hendrickson does not assert that school administrators prohibited him from wearing his communicative patch, while allowing other students to wear similarly provocative patches, jewelry, shirts, or jackets.  Thus, this case is distinguishable from those like Castorina v. Madison County Sch. Bd., 246 F.3d 536 (6th Cir. 2001), in which the school board prohibited plaintiffs from wearing shirts bearing the confederate flag, but allowed other students to wear shirts venerating Malcom X that were, under the prevailing circumstances, arguably at least as provocative.

21

The court also notes that Hendrickson has not challenged the School District's decision to temporarily ban the "Censored for Now" patch – a decision that also implicated constitutional protections.  Instead, both the School District's suit for declaratory judgment and Hendrickson's counterclaims focus exclusively on the decision to prohibit Hendrickson from wearing the "No Nazis" patch.

Finally, accepting Hendrickson's assertion that his patch was meant to convey (and would reasonably be understood by others to convey) a message of tolerance, he cannot reasonably argue that he was the victim of viewpoint discrimination.  As noted above, to the extent Hendrickson is sincere in claiming that his patch was meant to promote the idea and values of tolerance, school administrators fully embraced and endorsed that viewpoint. He was not prohibited from wearing the patch because school administrators disagreed with his asserted message of tolerance. See, e.g., Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 689 (1986) (Brennan, J., concurring) ("There is no suggestion that school officials attempted to regulate respondent's speech because they disagreed with the views he sought to express.").

On the other hand, discounting Hendrickson's assertion that
the patch was intended to (and did) express a message of
tolerance, and accepting a more plausible and objective
interpretation – that the patch conveyed opposition to Nazis and
the views and values espoused by Nazis, and was consistent with,
as Hendrickson put it, his desire to "get in the faces" of the
rival "redneck" group – school administrators concede that their
decision to prohibit Hendrickson from wearing the patch <u>was</u>
related in part to the viewpoint it appeared to express.  Not
opposition to an abstract anti-totalitarian viewpoint, but
opposition to a provocative characterization and condemnation of
a discrete group of students with whom Hendrickson and his
friends had had ongoing disputes that manifested themselves in
incidents of harassment, bullying, and threatened violence.  The
patch essentially said to the redneck group, albeit symbolically,
"You are Nazis, and I am opposed to your being in this school."
At least it could reasonably be construed as communicating that
or a substantively similar message.  As the School District puts
it:

> This patch, regardless of how it is now characterized
> [i.e., as one espousing tolerance], is completely
> contrary to one of the school's fundamental missions.
> It is a message of intolerance, a message of hate and
> dislike, that targeted other students.  It was spiteful

and aggressive toward another group of students [the
"rednecks"].

Plaintiffs' memorandum in support of summary judgment (document
no. 25) at 47.


I.    <u>The First Amendment — Governing Legal Framework</u>.

     It is well established that neither students nor teachers
"shed their constitutional rights to freedom of speech or
expression at the schoolhouse gate." <u>Tinker v. Des Moines Indep.</u>
<u>Community Sch. Dist.</u>, 393 U.S. 503, 506 (1969).  But, on the
other hand, it is equally plain that "the constitutional rights
of students in public school are not automatically coextensive
with the rights of adults in other settings." <u>Fraser</u>, 478 U.S.
at 682.  Consequently, under appropriate circumstances, students
may be prohibited from engaging in speech or expressive conduct
in school that the state could not prohibit outside the school
context.


     Although there is no easy or precise test that school
administrators can use to determine when they may properly
suppress or limit a student's speech — factual circumstances
often differ significantly — the Supreme Court has offered some
general guidance.  Public school administrators cannot ban the

24

"silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of [the student]."  <u>Tinker</u>, 393 U.S. at 508.  But, student speech "which for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech."  <u>Id</u>. at 513.

Since <u>Tinker</u>, the Supreme Court has twice considered the limits on a public school student's First Amendment freedoms.  In <u>Fraser</u>, <u>supra</u>, the Court upheld a school's decision to discipline a student after he used offensive and vulgar sexual innuendo in a speech given to a student assembly.  The Court concluded that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse."  <u>Id</u>. at 683.  Explaining its decision, the Court quoted Justice Black's dissent in <u>Tinker</u>, noting that it was "especially relevant":

> I wish therefore, . . . to disclaim any purpose . . .
> to hold that the Federal Constitution compels the
> teachers, parents, and elected school officials to
> surrender control of the American public school system
> to public school students.

<u>Fraser</u>, 478 U.S. at 686 (quoting <u>Tinker</u> 393 U.S. at 526 (Black, J., dissenting)).  Justice Black observed that, "[u]ncontrolled

25

and uncontrollable liberty is an enemy to domestic peace.  We cannot close our eyes to the fact that some of the country's greatest problems are crimes committed by the youth, too many of school age.  School discipline, like parental discipline, is an integral and important part of training our children to be good citizens."  Id. at 524.

In Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988), the Court concluded that school officials were entitled to exercise greater control over "school-sponsored" speech, such as the content of a student newspaper.

> [T]he standard articulated in Tinker for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression.  Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.

Id. at 272-73.

In this case, of course, school administrators were not faced with either school-sponsored speech, or vulgar, sexually explicit, or morally objectionable speech.  So, the Court's

decisions in <u>Fraser</u> and <u>Hazelwood</u> are not directly applicable to this dispute.  Nevertheless, each clearly recognizes the fundamental importance of the educational mission entrusted to the public school system, and the critical necessity of maintaining an orderly environment in which learning can take place.  As the Court of Appeals for the Third Circuit observed:

> The public school setting demands a special approach to First Amendment disputes.  Most students are minors, and school administrators must have authority to provide and facilitate education and to maintain order. The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 507 (1969).  On the other hand, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." <u>Id</u>. at 506.  Thus, students retain the protections of the First Amendment, but the shape of these rights in the public school setting may not always mirror the contours of constitutional protections afforded in other contexts.

<u>Sypniewski v. Warren Hills Regional Bd. of Educ.</u>, 307 F.3d 243, 252–53 (3d Cir. 2002).

Here, the controlling Supreme Court precedent is <u>Tinker</u>. And, as in <u>Tinker</u>, this case involves "the area where students in the exercise of First Amendment rights collide with the rules of

27

the school authorities." Tinker, 393 U.S. at 507.  In a similar
case the Sixth Circuit observed:

> This is a troubling case; on the one hand we are faced
> with the exercise of the fundamental constitutional
> right to freedom of speech, and on the other with the
> oft conflicting, but equally important, need to
> maintain decorum in our public schools so that the
> learning process may be carried out in an orderly
> manner.

Melton v. Young, 465 F.2d 1332, 1334 (6th Cir. 1972).


     To prevail on its motion for summary judgment, the School
District must show that, as a matter of law, the decision to
suppress Hendrickson's passive symbolic speech was justified
because school administrators reasonably concluded that
displaying the "No Nazis" patch was likely to "materially
disrupt" the educational environment, precipitate "substantial
disorder," or involve an "invasion of the rights of others."
Tinker, 393 U.S. at 513.  Concerns regarding disorder or
disruption are "reasonable" if those charged with maintaining
order and a viable educational environment can point to specific
facts "which might reasonably have led [them] to forecast
substantial disruption of or material interference with school
activities."  Id. at 514.  See also Saxe v. State College Area
Sch. Dist., 240 F.3d 200, 212 (3d Cir. 2001) ("[I]f a school can

28

point to a well-founded expectation of disruption – especially
one based on past incidents arising out of similar speech – the
restriction may pass constitutional muster."); <u>Boroff v. Van Wert
City Bd. of Educ.</u>, 220 F.3d 465, 470 (6th Cir. 2000) (holding
that the standard by which the school administrators' decision to
suppress student speech is measured is whether those
administrators acted in a "manifestly unreasonable" manner, under
the circumstances).

It is also well established that school administrators need
not wait until after incidents of disruption or violence have
occurred before they step in.  School authorities may lawfully,
and indeed are obligated to, take reasonable measures to prevent
such incidents and diffuse existing tensions.  <u>See, e.g.</u>, <u>Melton</u>,
465 F.2d at 1335 ("Surely those charged with providing a place
and atmosphere for educating young Americans should not have to
fashion their disciplinary rules only after good order has been
at least once demolished."); <u>Phillips v. Anderson County Sch.
Dist.</u>, 987 F. Supp. 488, 492 (D.S.C. 1997) ("School authorities
. . . are not required to wait until disorder or invasion occurs.
If there are substantial facts which reasonably support a
forecast of likely disruption, the judgment of the school
authorities in denying permission and in exercising restraint

29

will normally be sustained.  Indeed, it has been held that the
school authorities have a duty to <u>prevent</u> the occurrence of
disturbances.") (citations and internal punctuation omitted)
(emphasis in original).

On the other hand, a mere "undifferentiated fear or
apprehension of disturbance is not enough to overcome
[Hendrickson's] right to freedom of expression." <u>Id</u>. at 508.  As
noted in <u>Castorina</u>, 246 F.3d at 545, "[t]he critical issue . . .
is whether the principal acted on what he reasonably believed to
be actual evidence that the shirts [bearing the confederate flag]
would be disruptive.  So long as he was told by a student that a
confederate flag was the subject of the prior fight and he was
not unreasonable for believing that student, he had a reasonable
basis to infer that plaintiffs' shirts would spark more
disruption" (Kennedy, J. concurring).

The critical question raised by the parties' opposing
motions in this case, then, is how (and where) to draw the line
between a reasonable (and legally sufficient) fear of
disturbance, and one that is merely "undifferentiated."  The
School District's burden is a substantial one since, as the
Supreme Court noted:

> Any departure from absolute regimen may cause trouble.
> Any variation from the majority's opinion may inspire
> fear.  Any word spoken, in class, in the lunchroom, or
> on the campus, that deviates from the views of another
> person may start an argument or cause a disturbance.
> But our Constitution says we must take this risk; and
> our history says that it is this sort of hazardous
> freedom – this kind of openness – that is the basis of
> our national strength and of the independence and vigor
> of Americans who grow up and live in this relatively
> permissive, often disputatious, society.

Tinker, 393 U.S. at 508-09.  In other words, the School District

must demonstrate that "its action was caused by something more

than a mere desire to avoid the discomfort and unpleasantness

that always accompany an unpopular viewpoint."  Id. at 509.


II.   Suppression of Hendrickson's Speech was Lawful.

Hendrickson's position is a bit odd.  As mentioned, he

disputes the "No Nazis" interpretation of his patch.  Instead, he

says the patch is intended to communicate his adherence to and

promotion of the values of tolerance, diversity, and acceptance.

Although he doesn't put it quite this way, Hendrickson's

reasoning seems to be that the patch symbolizes opposition (the

international "no" symbol) to intolerance (the swastika,

representing fascism, national socialism, and totalitarianism),

and that symbolic opposition to intolerance is, itself, a message

of tolerance.  Perhaps.  But neither school authorities nor this

court are required to naively accept Hendrickson's implausible declaration of the patch's intended message.[3]

    If Hendrickson intended nothing more than a message of tolerance, then school authorities and he shared a mutual commitment.  If, on the other hand, he intended the patch as a message to the "redneck" group, or if school authorities could reasonably conclude that the patch was directed at and was likely to provoke the "redneck" group, then it was incumbent upon them

---

        [3]    When dealing with expressive conduct (rather than pure "speech"), the Supreme Court has made it clear that courts must apply an objective, rather than subjective, test in determining the message that is conveyed by that expressive conduct.  In other words, the "message" that is conveyed by the symbolic speech is determined from the perspective of a reasonable and well-informed observer, rather than from the perspective of the party engaged in that symbolic speech.

        While we have rejected the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea, we have acknowledged that conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.  In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.

Texas v. Johnson, 491 U.S. 397, 404 (1989) (citations and internal punctuation omitted).

to assess the risk of disruption and violence posed by the patch
and respond in a measured and reasonable way.

The dispositive issue here turns on the reasonableness of
the school authorities' assessment of the patch's likely purpose,
the message likely to be taken by those exposed to it, and their
assessment of the likelihood that, under all of the circumstances
known to them, displaying the patch at school would result in
substantial disorder or a disruption of the educational
environment.  It seems plain that a reasonable person would
readily understand the patch to express opposition to Nazis and
national socialism, as well as totalitarianism, fascism,
intolerance, and like ideas.  Most people living in a democratic
society, particularly those whose countries went to war to defeat
the Nazi regime, would probably enthusiastically join in
affirming identical opposition.  The First Amendment
unquestionably protects the expression of that political
viewpoint in a public forum.  And, even in a public school
setting, under ordinary circumstances, the First Amendment
protects such passive symbolic speech.

But the circumstances prevailing at Kingswood Regional High
School during the 2004-2005 school year were anything but

33

ordinary.  Given the overall context of demonstrated and
continuing hostility over a substantial period of time between
the two identified groups of students, and given the extensive
and continuous efforts by school administrators to supervise
those two groups, and to counsel peace and tolerance (both to
them specifically and the student body in general), and given the
ongoing incidents of harassment between the two groups, requiring
the imposition of discipline, including suspensions, as well as
two known instances of threats of physical violence, it was not
unreasonable for school authorities to put more faith in their
own informed and experienced judgment as to what was really going
on, than in Hendrickson's not-so-plausible explanation of the
patch's intended message and purpose.

     So, it comes down to this: whether the record establishes
that school authorities prohibited the "No Nazis" patch based
upon their reasonable forecast that allowing it to be worn would
likely have caused a substantial disruption of, or material
interference with school activities.  It does.

     School authorities could have reasonably concluded, under
the prevailing circumstances, that Hendrickson's symbolic speech,
as embodied in the "No Nazis" patch, was a message intended for

34

and aimed directly at the "redneck" group.  They also could have
reasonably inferred that Hendrickson's patch amounted to a
confrontational challenge to, or provocation of, that group of
students.

The objectively manifested message of the patch is "No
Nazis."  Given the history, school authorities could easily
conclude that the "redneck" group was being deliberately painted
by Hendrickson's group as Nazis, fascists, or oppressors.  While
some in the "redneck" group may have gladly accepted that
characterization (e.g., those with an affinity for uttering the
"Sieg Heil" greeting and those who admired Hitler), still, even
they might be expected to take umbrage at the "No" symbol insofar
as it constituted a direct statement of rejection of them and
their group by Hendrickson's group.  Others associated with the
"redneck" group could, no doubt, reasonably be expected to take
umbrage at both the classification and condemnation of them as
Nazis.  "Nazi" and "redneck" are not generally regarded as
synonymous classifications, and most people who gladly accept the
latter would probably object to being lumped in with the former.

The patch, in the overall factual context then prevailing at
the school, was decidedly more than a passive symbolic statement

35

of adherence to a general political or social belief in
tolerance.  School authorities reasonably determined that it was
actually a taunt, aimed directly at the opposing group of
students.  They also reasonably concluded that it was meant to be
confrontational, consistent with Hendrickson's concession to the
Superintendent – that he wanted to "get in their [members of the
"redneck" group] faces."  It was also consistent with the
continuous pattern of hostility and the incidents of provocation,
harassment, and threats between these two groups.  School
authorities were not required to put their heads in the sand and
allow further escalation of that hostility, and concomitant
disruption of the school environment, simply because Hendrickson
cloaked his patch in a laudable First Amendment justification.

     The First Amendment does not deprive school administrators
of the ability to rely upon their own considerable experience,
expertise, and judgment in recognizing and diffusing the
potential for disruption and violence in public schools.  Indeed,
they are duty–bound to do just that.  See, e.g., Marquay v. Eno,
139 N.H. 708, 717 (1995) ("School attendance impairs both the
ability of students to protect themselves and the ability of
their parents to protect them.  It is this impairment of
protection from which the special relationship between school and

student arises and from which the duty of supervision flows."). That duty is particularly acute when threats of physical violence have already been made and actual violence could well erupt if the hostile situation is not promptly and emphatically controlled.

School violence is, sadly, "an unfortunate reality that educators must confront on an all too frequent basis." LaVine v. Blaine School District, 257 F.3d 981, 987 (9th Cir. 2001). Here, school authorities did not act precipitously, nor did they overreact to a single incident. Rather, they carefully and methodically worked, over a substantial period, to alleviate the continuing hostility between the two groups, and banned Hendrickson's patch not as punishment, but only based upon their considered assessment of all that had gone on before, the then prevailing circumstances, and their expert judgment about the patch's actual message and its likely effect, in the context that presented itself. Their decision, involving as it did the safety of their students, is entitled to a fair measure of judicial deference, even when freedom of expression is involved. Id. at 992. School authorities were aware of the history, tension, manifested hostility, and student personalities involved. That knowledge and familiarity with the school and its students,

reasonably led them to forecast substantial disruption of or a
material interference with school activities.  <u>Tinker</u>, 393 U.S.
at 514.  It was reasonable for school authorities to conclude,
under all of the circumstances, that if Hendrickson were
permitted to wear the patch, it would likely precipitate further
discord, tension, harassment, and disruptive, even potentially
violent, behavior at school.  That, in turn, would disrupt the
educational environment and jeopardize the safety of not only the
members of the "gay" and "redneck" groups, but all students,
teachers, and staff as well.  The patch was lawfully banned, in
this case, under these circumstances.


III.  <u>Hendrickson's Other Claims</u>.

     Hendrickson will soon be graduating from high school.  And,
in an effort to expedite resolution of this case, he has moved to
withdraw his claim for "monetary damages against the [School]
District."  Defendants' motion to withdraw claim (document no.
36).  He has also waived his right to a jury trial, though this
summary disposition renders that waiver moot.


     Hendrickson's "motion to withdraw claim for monetary
damages" makes clear that he has withdrawn his request for a jury
trial and all monetary claims against the School District, but it

38

makes no specific mention of monetary claims against the
individual defendants.  Nevertheless, the court concludes that
Hendrickson necessarily intended to withdraw <u>all</u> monetary claims
advanced in his counterclaim complaint, including those against
the individual defendants, because failure to do so would
preclude resolution of this matter on the merits of his request
for permanent injunctive relief, <u>see</u> <u>Beacon Theatres, Inc. v.</u>
<u>Westover</u>, 359 U.S. 500 (1959) – an obstacle he unmistakeably
intended to remove.  Accordingly, that motion is granted and all
monetary claims are dismissed.

    Parenthetically, the court notes that: (1) even if
Hendrickson had proved that his First Amendment rights had been
violated, the individual defendants (in their individual
capacities) would be entitled to qualified immunity with regard
to Hendrickson's federal constitutional claims; (2) Hendrickson
has failed to point to an official "custom or policy" of the
School District that served as the motivating force behind the
alleged violation of his federally protected rights and,
therefore, has no monetary claim against those defendants in
their official capacities; (3) Hendrickson has failed to
demonstrate that the state statute he says defendants violated –
N.H. Rev. Stat. Ann. ch. 195–E – provides a private right of

action to those allegedly injured by its violation; (4)
Hendrickson has failed to identify any precedent suggesting that
the New Hampshire Constitution affords broader protections in the
area of public student free speech than the United States
Constitution; and, finally, (5) he has failed to show that he is
a member of a class intended to be protected by the provisions of
section 1985(3).[4]

    Accordingly, it is unlikely that any of his other claims
against those defendants would have survived summary judgment had
he not withdrawn them.  In any event, he has moved to withdrawn
those claims.  That motion is granted and those claims are
dismissed.

### Conclusion

    To be sure, if a state actor had attempted to prevent
Hendrickson from wearing the so-called "tolerance" patch in a
traditional public forum, this case could easily be resolved in

---

        [4]    See, e.g., Diva's Inc. v. City of Bangor, 411 F.3d 30,
38-39 (1st Cir. 2005) (noting that, "in order to state a claim
under Section 1985(3), the plaintiff must, among other
requirements, allege that the conspiratorial conduct of which he
complains is propelled by some racial, or perhaps otherwise
class-based, invidiously discriminatory animus.") (citations and
internal punctuation omitted).

40

Hendrickson's favor.  Even if his "tolerance" patch was specifically targeted at a particular group, and even if it expressed disdain or hatred for that group, still, the Constitution protects such symbolic speech.

But, public schools are not traditional public forums, like the town square or a public sidewalk.  Children are generally required by law to attend school through age 16, and thereafter most remain in pursuit of valuable learning and training. Teachers and administrators are obligated not only to educate, but also to protect public school students from harm and provide them with a safe, secure, and effective learning environment. Those are important obligations, and they must be balanced against students' rights to engage in free expression, which right is itself an essential part of the educational process.  It is often a difficult balance to strike, but it must be done.

Courts, in the end, must decide whether the balance has been lawfully struck, but should avoid too quickly second-guessing, from the quiet confines of a judge's chambers, the complex and difficult decisions made on a daily basis by teachers and school administrators.  School authorities are generally in a far better position to understand their students and the students' likely

41

response to various modes of intervention.  They are entitled to a healthy measure of deference when exercising judgment, drawing inferences, and reaching conclusions about what is actually going on in their schools and classrooms.  See, e.g., Fraser, 478 U.S. at 683 ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."); Tinker, 393 U.S. at 507 ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."); Epperson v. Arkansas, 393 U.S. 97, 104 (1968) ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities.").  Here, school authorities acted appropriately in light of the circumstances they faced, as they reasonably construed them.

For the foregoing reasons, the School District's motion for summary judgment (document no. 25) is granted.  Hendrickson's Motion to Withdraw Claim for Monetary Damages and Jury Trial (document no. 36) is granted, but his motion for summary judgment

42

(document no. 23) is denied.  The Clerk of Court shall enter

judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

March 15, 2006

cc:  Diane M. Gorrow, Esq.
     John P. Sherman, Esq.
     Stephen E. Borofsky, Esq.
     Erica U. Bodwell, Esq.

43